Filed 12/3/21  In re K.M. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re K.M., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LAURA T.,<br><br>    Defendant and Appellant;<br><br>P.B.,<br><br>    Intervener and Appellant. | G060185<br><br>(Super. Ct. No. 19DP1264)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Mary Kreber Varipapa, Judge.  Affirmed.

Law Offices of Arthur J. LaCilento and Arthur J. LaCilento, for Defendant and Appellant P.B.

Annie Greenleaf, under appointment by the Court of Appeal, for Defendant and Appellant Laura T.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*          \*          \*

In October 2019, Laura T. (mother) gave birth to K.M. (the child). Mother used methamphetamine during the pregnancy. Stephan M. (father) was aware of mother's prenatal drug use. The next day, Orange County Social Services Agency (SSA) took the child into protective custody. In December 2019, SSA placed the child in the foster home of D.T. and G.T. In May 2020, police shot and killed father. In November 2020, the court declared D.T. and G.T. to be the child's de facto parents.

In March 2021, paternal great aunt P.B. (appellant) petitioned the juvenile court to change its prior order and place the child in her custody. (See Welf. & Inst. Code, §§ 388 [modification of prior court order], 361.3 [preferential consideration of relative's request for placement].)[1] Following an evidentiary hearing, the court found it was not in the best interests of the child (then 17 months old) to remove him from the "only family that he's known" and denied appellant's section 388 petition.

On appeal, appellant argues the juvenile court abused its discretion by denying her section 388 petition. Appellant also argues she and the child's other relatives were denied due process of law. Mother joins in appellant's arguments.

We affirm the order of the juvenile court.


I

FACTS AND PROCEDURAL BACKGROUND

In October 2019, mother gave birth to the child. Mother had used methamphetamine while pregnant. Father had a history of drug and alcohol abuse, and was aware of mother's drug use during the pregnancy. The juvenile court granted a petition for protective custody. SSA placed the child in an emergency shelter home.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

SSA's initial detention report noted four paternal relatives were considered for placement: paternal grandfather, appellant, and two paternal aunts, Kim M. (PA1), and Michelle C. (PA2). The paternal relatives lived in Seattle, Washington. PA1 said she was willing to fly to California to take placement of the child "tonight." The report stated that PA1 was to be informed about the process for out-of-state dependency placements: the Interstate Compact on the Placement of Children (ICPC).

In December 2019, the juvenile court declared the child a dependent of the court, removed him from parental custody, and ordered reunification services. Later that month, SSA placed the child in a foster home with de facto parents (where the child lived continuously throughout the subsequent dependency proceedings).

*Reunification Period*

In April 2020, the juvenile court ordered an expedited ICPC for PA1. SSA informed PA1 "that while she will be considered for placement, whether the ICPC would occur, would depend on if the parents were in agreement to do so and if the ICPC was approved." SSA noted its "concern the parents have not come to a unanimous decision regarding the ICPC."

In May 2020, police shot and killed father during a confrontation.

In June 2020, ICPC informed PA1 that a home study could not be conducted because PA1 was not able to give up her then current Washington state foster care license and she was in the process of adopting another child.

In July 2020, PA1 informed SSA appellant was willing to be considered for ICPC placement. SSA attempted to contact mother regarding the placement of the child with appellant, but mother did not respond.

In August 2020, the court ordered an expedited ICPC for appellant.

3

In October 2020, the juvenile court terminated mother's reunification services and set a permanency planning hearing. (§ 366.26.)

*Postreunification Period*

In November 2020, the juvenile court declared D.T. and G.T. to be de facto parents of the child.[2] SSA had continuously reported over the prior months that child was doing well in his placement.

In December 2020, mother wrote a letter: "I believe that [the child] is best suited with [de facto parents] for permanent placement. I would never want to traumatize my child or risk his happiness or future because of removing him at this important stage in his life. Please acknowledge my choice and let him stay where he's at." A few days later, ICPC notified SSA that appellant had been approved for placement.

In February 2021, SSA filed reports with the juvenile court in advance of the permanency planning hearing. (§ 366.26.) SSA stated, "the child was not moved immediately to [appellant's] home in order to prevent multiple moves on behalf of the child as well as the agency's assessment of placement, such as the length of the time the child has remained with the current caregiver, the mother's preference of placement for the child, and the caregivers' willingness to maintain visitation with the mother, the mother's side of the family, and the father's side of the family."

SSA reported de facto parents were committed to adopting the child. SSA noted "the child is thriving under the care of his prospective adoptive parents. He cuddles with them and enjoys sitting in their laps and being held. He makes good eye

---

[2] "'De facto parent' means a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period." (Cal. Rules of Court, rule 5.502(10).)

4

contact, smiles often and appears happy and content in their presence. The prospective adoptive child shows many signs of attachment to the prospective adoptive parent's children. He gets plenty of playful interaction and attention from his foster sisters. The prospective adoptive child is flourishing under the care of the prospective adoptive parents and has become fully integrated into their family."

*Section 388 Hearing and Subsequent Proceedings*

On March 8, 2021, the juvenile court conducted a hearing on appellant's section 388 petition. After listening to arguments, the court denied the petition: "Court finds it is not in the best interest to remove the child."[3]

On April 16, 2021, the juvenile court conducted a permanency planning hearing. (§ 366.26.) The court terminated mother's parental rights.

On April 30, 2021, appellant filed a notice of appeal from the denial of placement.

On May 17, 2021, mother filed a notice of appeal from the denial of placement and the termination of parental rights.[4]

---

[3] The hearing will be covered in greater detail in the discussion section of this opinion.

[4] Mother joined in appellant's arguments regarding the denial of appellant's section 388 petition; however, mother offered no arguments or legal authorities in support of her appeal from the juvenile court's termination of parental rights. Therefore, mother's challenge to the termination of parental rights has been forfeited. (See *Mireskandari v. Gallagher* (2020) 59 Cal.App.5th 346, 391 [argument forfeited where the party failed to "provide any legal argument or citation to authority" to support it].)

5

II

DISCUSSION

Appellant argues the juvenile court:  A) abused its discretion by denying her section 388 petition; and B) denied her and the child's other relatives' right to due process of law.  We shall address each argument.

A.  *The Juvenile Court's Denial of Appellant's Section 388 Petition*

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child."  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)

We review a juvenile court's ruling under section 388 for an abuse of discretion.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)  We may reverse a juvenile court's denial of a party's section 388 petition only if we find the court has made """"an arbitrary, capricious or patently absurd determination.""""  We do not inquire whether substantial evidence would have supported a different ruling, nor do we reweigh the evidence, nor do we substitute our judgment for that of the court.  (*Ibid.*)

In this part of the discussion, we will:  1) review general legal principles regarding the preferential consideration of relatives in placement decisions; 2) summarize the relevant proceedings; and 3) apply the law to the facts.

1.  *General Legal Principles*

"In any case in which a child is removed from the physical custody of his or her parents . . . , preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative . . . ."  (§ 361.3, subd. (a).)

6

"'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) "The relative placement preference, however, is not a relative placement *guarantee . . . .*" (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 798.) The preference accorded by section 361.3 is not "'an evidentiary presumption that placement with a relative is in the child's best interests'"; rather, section 361.3 requires the juvenile court to determine whether such a placement is appropriate, applying the factors set forth in the statute. (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1295-1296.)

Section 361.3 delineates the factors to be considered: "The best interest of the child" (*id.*, subd. (a)(1)); "[t]he good moral character of the relative and any other adult living in the home" including any past history of violent criminal acts or child abuse or neglect (*id.*, subd. (a)(5)); "[t]he nature and duration of the relationship between the child and the relative" (*id.*, subd. (a)(6)); "[t]he safety of the relative's home" (*id.*, subd. (a)(8)(A)); and the relative's ability to "[p]rovide a safe, secure, and stable environment for the child," "[e]xercise proper and effective care and control of the child," "[p]rovide a home and the necessities of life for the child," and "[p]rotect the child from his or her parents" (*id.*, subd. (a)(7)(A)-(D)).

Although a juvenile court is required to consider the various factors under section 361.3, when a request for relative placement under section 361.3 is made alongside a "section 388 [motion] for change of placement after the termination of reunification services, the *predominant* task of the court [is] to determine the child's best interest." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 320, italics added.)

Once reunification is off the table, the focus "'shifts to the needs of the child for permanency and stability' [citation], . . . . [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus

in determining the ultimate question before it, that is, the best interest of the child."
(*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) Consequently, "regardless of the relative placement preference," once reunification services have been terminated, "the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected." (*Id.* at p. 321.)

### 2. Relevant Proceedings

On March 8, 2021, the juvenile court conducted an evidentiary hearing. (See § 388.) The court admitted into evidence various documents including a copy of appellant's foster home license, a family home study, and letters supportive of the child's placement with appellant. No witnesses testified at the section 388 hearing.

Appellant's counsel argued appellant's recent approval for placement was the required changed circumstance. (See § 388.) Counsel further argued "as far as best interest goes, my client clearly has some type of relationship. That's why the supplemental picture was provided . . . there's hugging there. There's contact."

Mother's counsel argued in favor of placing the child with appellant and further argued mother's prior statements opposing placement of the child with the paternal relatives were taken out of context. De facto parents' counsel, SSA's counsel, and the child's counsel argued against granting appellant's section 388 petition.

After listening to oral argument at the evidentiary hearing, the juvenile court stated its analysis as follows:

"I will look at the wishes of the parent. [I]t looks like the wishes of the parent were back and forth and they were mixed responses because if [the child] moves away, does that mean there's less contact? But as it stands now . . . the mother's wish specifically is that the relatives have placement.

8

"As to the father, that's almost -- that's one of the most tragic situations that we've had. . . . I can't just assume things, but looking at that situation, it would be hard to think that he did not want his relatives to have placement.

"So with that, looking at placement of siblings does not apply. The moral character, there is no one in this room that's here for placement regarding the de facto parents or the paternal relatives that there's any question about moral character or your ability to care for this child on either side.

"The duration and nature of the child's relationship, and this is where it gets most frustrating for the paternal relatives. How are you supposed to have a relationship with the child if you are following the rules and yet can't visit to the extent that you want to? I think that's the most frustrating situation . . . , along with the communication issues.

"But the situation we do have is that we've got a child who's 17 months old. We've got a child that's been with the de facto parents and has established a relationship with his de facto parents that will likely change the trajectory of his life in that the stability that's been given, those studies are clear that had that stability not been there, it could really have negatively affected everything that could happen in his life.

"So to that, I think that what we have is paternal relatives would give that stability in a heartbeat had that been a different situation and they're here to tell us that they'd do that in a second. The de facto parents are here, have taken on risk, have been the parents, have continued through this, and that's where we stand legally. The ability of the relatives to provide a safe and secure and stable environment, there's no doubt from anything that we've heard so far, again, that the paternal relatives would be anything but be a phenomenal placement. There's also nothing but positive regarding the de facto parents. They've been excellent. The child has thrived. That's what we have right now and [he] continues to thrive. Again, frustration comes from if he had been

9

placed with paternal relatives in the disposition. We'd be having this exact same conversation and that he thrives, and that's where we are.

"As to protecting the child, facilitating everything that needs to be facilitated, that is, I think, the same analysis, that the de facto parents have given nothing but support and support the visitation. Paternal relatives, had they been given the chance, it appears that it would have been the same situation, and they have come in to say so.

"The ability of the relative to arrange safe and appropriate child care, I think that is a nondiscussion about that would be something they would do. The safety of the relatives' house has been approved by the ICPC. I think that's one that's been shown, gone through all the ICPC requirements as well as foster care requirements and taking classes. I think I recall you taking classes above and beyond those. This is not just we're going to file the paperwork. There's been -- you've moved. You've taken the classes. You've done every visit. You've done every possible thing that you've been asked to. So that's where we are right now in this analysis.

"It is an impossible analysis on any emotional level because you've got relatives who have lost their only son, slash, brother. You have this child in the mix and you have the de facto parents who have been the only parents in the last . . . 15 months continuously, but the court is going to follow the law, will always follow the law, and I have to follow the law on this.

"And in this -- although this preference has been raised, the relative preference, the taking a child who is 17 months [old] out of the only . . . placement, only family that he's known, that becomes . . . -- I think the largest part of the deciding factor. With that removal . . . from everything that he's known during all of this developmental phase . . . . And that's where the court is finding that it is not in his best interest to be moved."

10

The juvenile court then formally denied appellant's section 388 petition and calendared the permanency placement hearing.

### 3. Application and Analysis

The juvenile court was conversant with the appropriate legal principles, as demonstrated by its thorough analysis of the factors it was required to consider under section 361.3. The court was also familiar with the evidence, as demonstrated by its recitation of the pertinent facts. The court then made a difficult decision, but a decision that was plainly grounded in the appropriate law and the relevant facts.

In short, the juvenile court did not approach its decision in an arbitrary or capricious manner. Quite the opposite. The court's decision was well reasoned and empathetic. Consequently, while we recognize other courts may have come to a different ruling, we cannot find the court in any manner abused its discretion. Thus, we must affirm the court's denial of appellant's section 388 petition.

Citing only section 361.3 (and no case law), appellant argues the preference for placement with relatives favors placement with her. We disagree.

Again, the statutory "preference" for relatives simply "means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) The preference is not "'an evidentiary presumption'"; rather, the statute simply requires the juvenile court to consider the factors set forth in the statute. (*In re R.T.*, *supra*, 232 Cal.App.4th at pp. 1295-1296.)

Here, the juvenile court weighed the appropriate factors and determined within its discretion that it was not in the best interests of the child to be removed from the de facto parents. Accordingly, we affirm the juvenile court's order denying appellant's section 388 petition.

11

*B. Due Process of Law*

Appellant argues she and the child's other relatives were denied notice and an opportunity to be heard (procedural due process) because they "were never fully informed as mandated by W.I.C. Section 309." Appellant's argument is not supported within the appellate record.

"Upon delivery to the social worker of a child who has been taken into temporary custody . . . , the social worker shall immediately investigate the circumstances . . . and attempt to maintain the child with the child's family through the provision of services." (§ 309, subd. (a).) Under section 309, the county social worker is "required to identify and locate adult relatives for possible placement, including relatives suggested by the parents." (*In re R.T.*, *supra*, 232 Cal.App.4th at p. 1296.)

"The social worker shall provide to all adult relatives who are located, except when that relative's history of family or domestic violence makes notification inappropriate, within 30 days of removal of the child, written notification and shall also, whenever appropriate, provide oral notification, in person or by telephone . . . ." (§ 309, subd. (e)(1).) Written notice is to include: "An explanation of the various options to participate in the care and placement of the child and support for the child's family, including any options that may be lost by failing to respond. The notice shall provide information about providing care for the child while the family receives reunification services with the goal of returning the child to the parent or guardian, how to become a resource family, and additional services and support that are available in out-of-home placements . . . ." (§ 309, subd. (e)(1)(B).) "The State Department of Social Services, in consultation with the County Welfare Directors Association of California and other interested stakeholders, shall develop the written notice." (§ 309, subd. (e)(1)(B).)

12

There is no evidence in the record to support appellant's claim that she and/or other family members did not receive written and/or oral notice under the provisions of section 309. Indeed, the record supports an inference appellant and the other paternal family members were properly notified. (See Evid. Code, § 664 ["It is presumed that official duty has been regularly performed"].)

In appellant's declaration in support of her section 388 petition, she averred: "CPS removed [the child] from his parents' care a few days after he was born. As we are a very tight knit family, we were all devastated. The absolute first thing we did *was to find out* when we could come and pick [the child] up and take him home to his family. We did not want our nephew ever in the system, as our mother was adopted, and always felt unwanted by her biological family. *I informed CPS* that there are many of us who are qualified to take full care and responsibilities of our nephew. *We were told* that we could not just simply come and pick him up, we had to **go through the process** by CPS." (Italics added.) Further, in the initial detention report, SSA listed each of the paternal relatives and their contact information.

Based on our review, it appears the paternal relatives were notified by SSA soon after the child was taken into protective custody so there was no due process violation as appellant claims. In any event, even if we were to find SSA, in fact, violated section 309, appellant has failed to provide any legal authority or compelling argument establishing that the appropriate remedy would be to now overrule the section 388 ruling of the juvenile court. (See Cal. Rules of Court, rule 5.695(e)(2) [when a juvenile court finds the social worker has not exercised due diligence under section 309, the court "may require a written or oral report to the court"].)

13

III

DISPOSITION

The order of the juvenile court is affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.

14